**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS E. SPRINGER, in his capacity as trustee of the Chapter 7 bankruptcy estate of ROCIO HERRERA-NEVAREZ,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 17 C 3930** |
| **ETHICON, INC., and JOHNSON & JOHNSON,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Rocio Herrera-Nevarez (Herrera) sued Ethicon, Inc. and Johnson & Johnson, alleging that she suffered injuries arising from her use of a medical device they manufactured. After a seven-day trial, the jury found in Herrera's favor on her claim of negligent misrepresentation and awarded her $55,000 in compensatory damages for medical expenses. The jury found in favor of the defendants on Herrera's additional negligence and strict liability claims, and it declined to award punitive damages. Defendants have filed a renewed motion for judgment as a matter of law on Herrera's claims, and Herrera has moved for a new trial on damages or, in the alternative, a new trial on all issues. Herrera also has submitted a bill of costs, to which defendants object. For the reasons stated below, the Court denies defendants' renewed motion for judgment as a matter of law and denies plaintiff's motion for a new trial. The Court upholds some of defendants' objections to Herrera's bill of costs and overrules others.

**Background**

The Court assumes familiarity with the June 2017 summary judgment opinion in this case, and it draws on that opinion for a portion of the background information provided herein. *See Herrera-Nevarez v. Ethicon, Inc.*, No. 17 C 3930, 2017 WL 2591989 (N.D. Ill. June 15, 2017). In 2005, Herrera was surgically implanted with a Gynecare TVT Obturator System (TVT-O), which is a type of midurethral sling manufactured by Ethicon and designed to be implanted in the pelvic area to treat stress urinary incontinence in women. Between December 2009 and October 2011, Herrera began visiting a gynecologist to receive treatment for a number of gynecological and genitourinary symptoms, including pelvic pain, urinary problems, and painful sexual intercourse. In October 2011, Herrera saw a television advertisement that discussed safety issues associated with devices like the TVT-O. In March 2012, she filed a lawsuit against Ethicon in this district. The following month, Herrera's case was transferred to the Southern District of West Virginia as part of multi-district litigation (MDL) proceedings coordinated out of that district. While the case was pending in West Virginia, Herrera filed an amended complaint adding Johnson & Johnson as a defendant. Herrera's case proceeded through discovery and other pre-trial proceedings as part of the MDL, and, in January 2017, the judge presiding over the MDL granted summary judgment in favor of defendants on some of Herrera's claims but denied summary judgment on others.

The case was remanded to this district for trial in February 2017. In May 2017, defendants moved for summary judgment on all of Herrera's remaining claims. Defendants argued primarily that Herrera was judicially estopped from asserting her

personal injury claim because she failed to disclose it during her 2011 bankruptcy proceedings. Defendants also argued that although Herrera was not the real party in interest in this case, the Court should not allow her to substitute the trustee of her bankruptcy estate as the plaintiff. In May 2017, the Court overruled defendants' substitution argument and granted Herrera's motion to substitute Thomas E. Springer, the trustee of her Chapter 7 bankruptcy estate, as the real party in interest. *See* May 16, 2017 Minute Entry (dkt. no. 177). The Court subsequently overruled defendants' judicial estoppel argument and denied summary judgment in a June 2017 opinion. *See Herrera-Nevarez*, 2017 WL 2591989, at *4.

The case went to trial in August 2017. Defendants filed a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) at the close of Herrera's case, and they renewed their motion at the end of the trial, just before the case was submitted to the jury. The Court submitted three claims to the jury: negligence, strict liability, and negligent misrepresentation. The negligence and strict liability claims were both brought under theories of failure to warn and defective design. As previously noted, the jury found in favor of the defendants on the negligence and strict liability claims, and it found in Herrera's favor on her claim of negligent misrepresentation and awarded $55,000 in compensatory damages. The jury did not award any punitive damages, damages for past or future pain and suffering or damages for loss of a normal life; all $55,000 was allocated to "[t]he reasonable expense of necessary medical care, treatment, and services received." Pl.'s Mot. for New Trial, Ex. A.

Defendants have filed a renewed motion under Rule 50(b) for entry of judgment

as a matter of law.  In support of this motion, defendants incorporate by reference the arguments made in their summary judgment motion involving judicial estoppel.  They further argue that judgment as a matter of law is proper on the negligent misrepresentation claim because Herrera did not submit sufficient evidence (1) of any allegedly false representation by Ethicon other than the TVT-O Instructions for Use, which defendants contend cannot support the claim; (2) that Dr. Vassallo—the doctor who recommended and implanted Herrera's TVT-O—relied on any representation by Ethicon; and (3) that any reliance on an alleged misrepresentation by Ethicon caused Herrera's injuries.  Defendants also present arguments pertaining to Herrera's strict liability and negligence claims for the Court to consider in the event that it sets aside the jury's verdict in their favor on those claims pursuant to Herrera's motion for new trial.

Herrera has moved for a new trial on damages or, in the alternative, a new trial on all issues.  First, Herrera contends that a new trial on damages is warranted on the ground that the jury's award of $0 for pain and suffering was manifestly inadequate. She further argues that the Court erred in excluding a June 2011 report on pelvic mesh degradation commissioned by Ethicon and evidence that Ethicon's competitors removed their own midurethral slings from the market due to complications associated with the slings.  Herrera contends that these alleged errors deprived her of a fair trial and that she is therefore entitled to a new trial on the issue of damages.  In the alternative, Herrera argues that these same errors, in combination with the Court's denial of her request to list "failure to test" as another basis for liability for negligence in the jury instructions provide a basis for granting a new trial on all issues.

Herrera also has submitted a bill of costs.  Defendants object to the bill of costs

on a several grounds. They first argue that costs should be denied entirely or globally reduced by 75 percent to account for the fact that Herrera prevailed on only one of the claims that the Court submitted to the jury. Defendants also take issue with the majority of the specific costs requested.

The Court addresses each of these motions in turn.

## Discussion

### A. Defendants' renewed motion for judgment as a matter of law

On a renewed motion under Rule 50(b) for judgment as a matter of law, a court is "limited to deciding only whether the evidence presented at trial, with all the reasonable inferences drawn there from, is sufficient to support the verdict when viewed in the light most favorable to the [nonmoving party]." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1043 (7th Cir. 2000) (internal quotation marks and citation omitted); *see also Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) ("In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence."). After reviewing all the evidence in the record, a court must disregard all evidence favorable to the moving party that the jury was not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). A jury verdict will be overturned only if the court concludes that "no rational jury could have found for the plaintiff." *Hasham*, 200 F.3d at 1043 (citation omitted).

The Court adopts and reaffirms its earlier decisions with respect to the substitution and judicial estoppel arguments initially presented in defendants' May 2017

motion for summary judgment.  The present ruling focuses solely on the issues raised for the first time in defendants' latest renewed motion for judgment as a matter of law.

As previously noted, the jury returned a defense verdict on Herrera's negligence and strict liability claims, both of which were brought under failure to warn and design defect theories.  Defendants contend that, in reaching a verdict for the defense on those claims, the jury necessarily found either that the TVT-O Instructions for Use (IFU) were adequate or that any inadequacy in the instructions did not cause Herrera's injury. Defendants therefore argue that any alleged misrepresentation in the IFU cannot support a verdict in favor of Herrera with respect to the negligent misrepresentation claim.

Defendants seem to assume that a verdict in favor of Herrera on the negligent misrepresentation claim would be inconsistent with verdicts in favor of defendants on the negligence and strict liability claims.  The Court disagrees.  Although civil juries must return consistent verdicts, courts are required to reconcile apparently inconsistent verdicts if it is possible to do so.  *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005); *see also Am. Cas. Co. of Reading, Pa. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1306 (7th Cir. 1993) ("[W]e should do what we can to save the verdict against the specter of inconsistency.").  The jury instructions given in this case stated that the plaintiff had to prove each of the following elements by a preponderance of the evidence to prevail on a negligent misrepresentation claim:

> 1. The defendants made an inaccurate or false statement of material fact to prescribing physicians regarding the safety and reasonable fitness of the TVT-O.  A statement of fact is material if it is capable of influencing the decision of a prescribing physician.
>
> 2. The defendants were negligent in ascertaining the truth of the statement.

6

The term "negligence" means failing to do something that a reasonably careful medical device manufacturer would do, or doing something that a reasonably careful medical device manufacturer would not do, under circumstances similar to those shown by the evidence.

3. When the defendants made the inaccurate or false statement, they intended to induce the plaintiff's physician to act.

4. The plaintiff's physician acted in reliance on the truth of the statement made by the defendant.

5. The plaintiff was damaged as a result of her physician's reliance on the statement.

6. The defendant had a duty to communicate accurate information to the plaintiff's physician.

Pl.'s Mem. in Resp. to Defs.' Rule 50(b) Mot. (Pl.'s Rule 50(b) Resp.), Ex. B. By contrast, the instructions on negligence stated that the jury should find for Herrera if she proved by a preponderance of the evidence that:

1. The defendants [failed to design the TVT-O properly and / or failed to adequately warn prescribing doctors of the risks associated with the product], and that in so acting or failing to act, the defendants were negligent.

2. The plaintiff was injured.

3. The defendants' negligence was a proximate cause of the plaintiff's injury.

Pl.'s Rule 50(b) Resp., Ex. A. The jury instructions for the strict liability claim stated that, for the jury to find for Herrera on this claim, she had to prove each of the following elements by a preponderance of the evidence:

1. One or both of the conditions listed as (a) and (b) [either (a) it had a defective design and / or (b) the defendants failed to provide adequate warnings to prescribing doctors of the risks associated with the TVT-O] existed in the TVT-O at the time it left the defendants' control.

2. The condition made the TVT-O unreasonably dangerous.

3. The plaintiff was injured.

4. The condition was a proximate cause of the plaintiff's injuries.

*See* Trial Tr. 1317:19-1318:1 (dkt. no. 341).

In contrast with the strict liability and negligence jury instructions, the negligent misrepresentation instruction makes no mention of inadequate warnings; instead, the negligent misrepresentation claim depends on proof of an "inaccurate or false statement of material fact to prescribing physicians regarding the safety and reasonable fitness" of the product. Pl.'s Rule 50(b) Resp., Ex. B. In this case, the jury could have found that the IFU contained an inaccurate or false statement of material fact because, as Herrera pointed out during trial, it specifically stated that the TVT-O's Prolene mesh material "is not absorbed, *nor is it subject to degradation* or weakening by the action of tissue enzymes." Defs.' Rule 50(b) Mot., Ex. C, at 7 (emphasis added). Through expert witness Dr. Rosenzweig, Herrera presented evidence that defendants were aware of degradation problems with the mesh long before 2005. For example, Dr. Rosenzweig testified that an internal Ethicon study from 1992, which the jury received into evidence, showed that, in animal testing, Prolene, "which is the same material that's made up of [sic] the TVT obturator, was degrading and the degradation was increasing at seven years." Pl.'s Rule 50(b) Resp., Ex. C 380:5-380:11.

It is not inconsistent for the jury to find that Dr. Vassallo relied on an inaccurate or false statement in the IFU, which ultimately caused injury to Herrera, and to simultaneously conclude that Herrera failed to meet her burden of proof to show that, overall, defendants failed to adequately warn of the risks associated with the TVT-O. And, notwithstanding defendants' arguments to the contrary, it is not the case that, in returning a verdict for defendants on negligence and strict liability, the jury necessarily

8

found that every statement in the IFU was either true or did not cause injury to Herrera. Lastly, defendants' contention that the statement in the IFU regarding degradation is irrelevant because "[i]n a case involving a prescription device, it is the physician's knowledge of the complication that counts, not the material characteristic that causes a complication" is equally without merit. Defs.' Reply in Supp. of Rule 50(b) Mot. at 3. Defendants cite no authority to support this proposition, and it is unsupported by the jury instructions for negligent misrepresentation, which encompass all "inaccurate or false statement[s] of material fact . . . regarding the safety and reasonable fitness of the TVT-O." Pl.'s Rule 50(b) Resp., Ex. B. Whether the mesh used in the device is subject to degradation is clearly related to its safety and reasonable fitness. The Court therefore overrules defendants' arguments that allegedly inaccurate or false statements in the IFU cannot form the basis of Herrera's negligent misrepresentation claim.

Defendants also argue that there is no evidence that Dr. Vassallo relied on the IFU. Dr. Vassallo acknowledged in his deposition testimony[1] that certain information he was shown during litigation about the mesh being subject to degradation contradicted the IFU's assurance that the mesh did not degrade. *See* Pl.'s Rule 50(b) Resp., Ex. F 186:15-186:16. Nonetheless, when asked whether he would have liked to have known such information before deciding to use the TVT-O in patients, he responded, "[i]t doesn't change my opinion, so no." *Id.* 186:17-186:22. In fact, Dr. Vassallo testified that he did not rely on the IFU in recommending and implanting Herrera's TVT-O, or in warning Herrera about the risks related to the device:

Q.    Did you rely on this IFU package insert in your recommendation of

---

[1] A video recording of Dr. Vassallo's testimony was played for the jury during the trial.

TVT-O to Ms. Herrera in 2005?

A.      No.

Q.      Did you rely on this IFU package insert for instruction as to how to perform the May 2005 procedure?

A.      No.

Q.      Did you rely on this IFU package insert for information about risks related to the May 2005 procedure?

A.      No.

Defs.' Mem. in Supp. of Rule 50(b) Mot. for J. as a Matter of Law. (Defs.' Rule 50(b) Mot.), Ex. B 157:7-157:18.  Dr. Vassallo stated that he "rel[ies] on [his] own expertise and ability to provide appropriate care for [his] patients."  *Id.* 38:3-38:5.

As Herrera points out, however, Dr. Vassallo also testified that he generally relies upon manufacturers to include adequate warning information in the IFU.  *See id.* 38:17-22 (responding "[y]es" to the question "[s]o you rely upon manufacturers to include adequate warning information in those informations [sic] for use, correct?").  Dr. Vassallo explained that, although he does not review the IFU each time he performs a surgery, he does review the IFU prior to using a product.  *Id.* 38:9-38:16; *see also id.* 42:11-42:15 ("Have I looked at it?  I have.  It would have been early on when we started to use TVT-O and after I – it became something I did commonly in my practice, I wouldn't have looked at it again.").  He also testified that, at the time of Herrera's implant, he believed that the information in the IFU was both accurate and complete and that the TVT-O was safe and effective.  Pl.'s Rule 50(b) Resp., Ex. F 45:5-45:12, 68:7-68:11.  Lastly, he stated that he was not aware of any studies that show mesh degradation and that he was not aware of Prolene degrading.  *Id.* 202:17-202:18, 203:2-

203:4.

On this record, the Court cannot say that no rational jury could have found reliance. Although Dr. Vassallo denied relying on the IFU in Herrera's case, in light of his other testimony regarding his general review of and reliance on the information contained in such Instructions for Use, a rational jury could have concluded that he did, in fact, act in reliance on defendants' assurance in the IFU that the mesh was not subject to degradation.

Lastly, defendants argue that no rational jury could have concluded, based on the evidence adduced at trial, that Herrera suffered injuries as a result of Dr. Vassallo's alleged reliance on misrepresentations in the IFU. This argument overlaps with defendants' reliance argument. Defendants do not argue that no rational jury could have concluded that Herrera's injuries were caused by the TVT-O; instead, they argue that no rational jury could have found that Dr. Vassallo would have acted differently if not for the alleged misrepresentation in the IFU, because he testified that he stood by his decision to implant the TVT-O and that he would not have done anything differently. *See* Defs.' Rule 50(b) Mot., Ex. B 70:24-71:6. In response, Herrera argues (1) that she was not required to prove that Dr. Vassallo would have acted differently in the absence of the alleged misrepresentations, and (2) that she provided sufficient evidence from which a jury could conclude that proper representations regarding the TVT-O's safety and reasonable fitness would have dictated a different result in this case.

As an initial matter, the Court agrees that Herrera was not required to prove that Dr. Vassallo would have acted differently if not for the allegedly inaccurate or false statements in the IFU. As the jury instructions make clear, Herrera needed to prove that

Dr. Vassallo acted in reliance on an inaccurate or false statement of material fact and that she was damaged as a result of that reliance. The jury was not instructed that, to find for Herrera on her negligent misrepresentation claim, they would need to find that the doctor would have acted differently but for the materially inaccurate or false statement (and defendants do not argue that this instruction was erroneous). The Court has already concluded that, when the evidence is viewed in the light most favorable to Herrera, a rational jury could have found that Dr. Vassallo relied on the TVT-O IFU's assurance that the mesh was not subject to degradation. Moreover, as explained below, viewing the evidence in the light most favorable to Herrera, a rational jury could have found that Dr. Vassallo, despite his testimony, would have acted differently in the absence of defendants' alleged misrepresentations.

Herrera contends that a rational jury could have discounted Dr. Vassallo's testimony that information regarding the possibility of mesh degradation would not have influenced his decision based on other evidence in the record. Specifically, Herrera points to Dr. Vassallo's testimony that Ethicon paid for his trip to Belgium to learn how to implant the TVT-O and that, many years ago, he received compensation from Ethicon for instructing other doctors on implanting TVT slings. *See* Pl.'s Rule 50(b) Resp., Ex. F 15:18-16:12, 184:2-185:7. Herrera further notes Dr. Rosenzweig's testimony that, as a doctor, he would want to have information about possible mesh degradation when assessing the safety of the TVT-O prior to use. Pl.'s Rule 50(b) Resp., Ex. C 380:25-381:2. Based on Dr. Rosenzweig's testimony and Dr. Vassallo's past interactions with Ethicon, Herrera contends that a rational jury "could reasonably have looked askance at his defense of the decision to use the TVT-O in 2005." Pl.'s Rule 50(b) Resp. at 8.

Construing the evidence in favor of Herrera, the Court agrees that the jury would not have been required to adopt Dr. Vassallo's testimony that information regarding possible mesh degradation risks would not have changed his decision. As the court noted in *Noyola v. Johnson & Johnson*, No. 85 C 2184, 1986 WL 14657, at *4 (N.D. Ill. Dec. 16, 1986), such testimony is "only one piece of evidence" for the factfinder to consider. *See also In re Prempro Prod. Liab. Litig.*, No. 4:03CV1507-WRW, 2006 WL 1981902, at *3 (E.D. Ark. July 13, 2006) ("I'm not convinced that a physician's testimony regarding what he or she would have done in 20/20–hindsight should be considered absolute. It appears to me that such testimony may well hinge on credibility, which is for the jury [to] decide."); *Golod v. La Roche*, 964 F. Supp. 841, 857 (S.D.N.Y. 1997) ("[U]nless a physician's claim that she would have prescribed a drug even if adequately warned is self-disserving, the credibility of such a claim is generally a jury question not to be resolved on a motion for summary judgment."). And other testimony by Dr. Vassallo points in the opposite direction. As previously noted, Dr. Vassallo testified that he believed that the information in the IFU was accurate and complete at the time of Herrera's implant. He stated in his deposition that he was not aware of Prolene degrading. In light of Dr. Vassallo's apparent lack of awareness of TVT-O mesh degradation risks, in combination with the evidence that he received paid travel and other compensation from Ethicon, a rational jury could have found that Dr. Vassallo would not have used the TVT-O in 2005 if, instead of being inaccurately assured that the mesh was not subject to degradation, he had been made aware of possible degradation risks.

The Court therefore denies defendants' renewed motion for judgment as a matter

of law on Herrera's negligent misrepresentation claim. The Court need not address the remainder of the motion because the jury found in favor of defendants on Herrera's negligence and strict liability claims and, as explained below, the Court is denying Herrera's motion for a new trial.

**B.     Herrera's motion for a new trial**

A new trial is warranted under Rule 59 of the Federal Rules of Civil Procedure if the verdict is against the manifest weight of the evidence. *See, e.g.*, *Mejia v. Cook County*, 650 F.3d 631, 633 (7th Cir. 2011); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000). A new trial may be granted if the court finds that the verdict is against the clear weight of the evidence or that the trial was not fair to the moving party. *Whitehead v. Bond*, 680 F.3d 919, 927 (7th Cir. 2012). Nonetheless, the Seventh Circuit has cautioned that a court should grant a new trial "only if the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Plyler v. Whirlpool Corp.*, 751 F.3d 509, 513 (7th Cir. 2014) (internal quotation marks and citation omitted). Although Herrera's motion for a new trial is governed by federal law, substantive questions raised in the motion are governed by Illinois law. *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1397 (7th Cir. 1997) (applying state law to the substantive question, raised in a motion for new trial, of whether the evidence supported the jury's damages award); *M.T. Bonk Co. v. Milton Bradley Co.*, 945 F.2d 1404, 1407 (7th Cir. 1991) (in a diversity case, motion for new trial is governed by federal law, but state law applies to resolve all substantive questions raised in the motion).

## 1. Zero damages for pain and suffering

Herrera argues that a new trial on damages is warranted in light of the jury's award of $0 for pain and suffering. Specifically, Herrera contends that the jury overlooked uncontested evidence of pain and suffering, resulting in a damages award that was manifestly inadequate, ignored a proved element of damages, and bore no reasonable relationship to the losses she suffered.

Generally, under Illinois law, the determination of damages is a question of fact that is left to the jury's discretion. *Snover v. McGraw*, 172 Ill. 2d 438, 447, 667 N.E.2d 1310, 1315 (1996); *Hollis v. R. Latoria Const., Inc.*, 108 Ill. 2d 401, 407, 485 N.E.2d 4, 6 (1985). In Illinois, a court "will not upset a jury's award of damages unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered." *Snover*, 172 Ill. 2d at 447, 667 N.E.2d at 1315. The Illinois Supreme Court has explained that, in some cases, such as those in which the evidence clearly and objectively shows that the plaintiff suffered a serious injury, a verdict that awards damages only for medical expenses, with no damages awarded for pain and suffering, may be inappropriate. *Id.* at 449, 667 N.E.2d at 1316. Nonetheless, the Illinois Supreme Court has expressly held that it is not inconsistent for a jury to award pain-related medical expenses but decline to award damages for pain and suffering where the plaintiff had "few, if any, objective symptoms of injury" and relied instead on "subjective complaints of pain." *Id.* at 448-49, 667 N.E.2d at 1315-16.

Herrera contends that she requested damages for three types of injuries: (1) recurrent urinary tract and bladder infections, (2) pelvic pain, and (3) painful sexual

intercourse.  *See* Pl.'s Mot. for New Trial at 10.  She testified that the infections were

very painful and that "[i]t feels like you're urinating fire."  Pl.'s Mot. for New Trial, Ex. C

763:12, 785:1-785:3.  She testified that she sought medical care for pelvic pain on

numerous occasions.  *See id.* 761:20-762:15, 763:1-763:25, 766:22-766:24.  Herrera

also testified that she began experiencing painful sexual intercourse in 2009.  *See id.*

744:5-744:15, 761:8-761:10.  Herrera's medical records and Dr. Rosenzweig's

testimony confirm that, starting in 2011, Herrera frequently sought medical care for

urinary tract infections and complaints of pelvic pain.  *See, e.g.*, *id.* 440:22-440:24,

442:1-442:18, 443:10-443:17, 444:2-444:24.  Herrera also points to a number of

medical records admitted into evidence that reflect complaints of infections, pelvic pain,

tenderness in certain portions of the vagina on examination, and painful intercourse.

*See* Pl.'s Mot. for New Trial, Exs. E-JJ.

Herrera argues that, by finding in her favor on the negligent misrepresentation

claim and awarding damages for medical expenses, the jury necessarily found that

these injuries were caused by the TVT-O.  She further argues that, although defendants

disputed that the TVT-O caused her injuries, they did not dispute the existence or extent

of her injuries.  That much appears to be true.  Defendants' expert, Dr. Elser, did not

contest the existence of Herrera's injuries and related pain; instead, she attributed

Herrera's pelvic pain complaints primarily to her bladder and urinary tract infections, and

attributed the infections themselves to diabetes, which Herrera was diagnosed with in

October 2011.  Defs.' Resp. to Pl.'s Mot. for New Trial, Ex. A 597:12-597:14, 912:21-

913:3, 918:15-919:14, 938:2-938:15.  As Herrera notes, defendants themselves

acknowledged in their closing argument that she experienced a "very marked increase

in . . . infections" beginning in 2011.  Pl.'s Mot. for New Trial, Ex. C 1391:9-1391:10.

Nor did defendants dispute Herrera's complaints of pain; they argued instead, in light of

Dr. Elser's testimony, that the infections and related pain were attributable to her

diabetes rather than the TVT-O.  *Id.* 1391:13-1391:14.

In light of the above, Herrera contends that "there is no doubt that [she] sustained

an injury that produced pain and suffering."  Pl.'s Mot. for New Trial at 14.  Herrera

argues that this case is distinguishable from *Snover v. McGraw*, in which the Illinois

Supreme Court upheld a jury verdict that awarded medical expenses, but no damages

for pain and suffering, because in *Snover*, the plaintiff presented little or no evidence of

pain and suffering.  Herrera contends that this case is more analogous to *Murray v.

Philpot*, 305 Ill. App. 3d 513, 516, 713 N.E.2d 152, 155 (1999), and *Stamp v. Sylvan*,

391 Ill. App. 3d 117, 126, 906 N.E.2d 1222, 1230 (2009), in which the courts held that,

where the plaintiff had presented objective evidence of pain and suffering, the jury's

decision to award zero damages for pain and suffering impermissibly ignored a proven

element of damages.  Defendants argue that this case is much closer to *Snover*

because Herrera's evidence of pain is primarily subjective and because a jury could

have concluded that her pain was instead attributable to her diabetes.

The plaintiffs in *Snover*, a mother and daughter, sued to recover for personal

injuries the daughter suffered in a car accident.  *Snover*, 172 Ill. 2d at 440, 667 N.E.2d

at 1311-12.  The daughter made no complaints of neck pain when she was taken to the

emergency room following the collision, and the emergency room records showed that

she had full range of motion in her neck.  *Id.* at 441, 667 N.E.2d at 1312.  When the

daughter began complaining of headaches two days after the collision, her doctor

ordered a CAT scan, which showed no sign of head injury.  *Id.*  Approximately four months after the accident, she visited a neurologist, complaining of headaches, dizziness, and neck pain.  *Id.* at 442, 667 N.E.2d at 1312.  The neurologist diagnosed her as suffering from cervical strain, and recommended physical therapy; the daughter ultimately attended nine physical therapy sessions.  *Id.*  Although she missed a few days to a week of tennis and gym class after the accident, she testified at trial that she was able to play tennis regularly and to participate on the track team.  *Id.* at 441, 667 N.E.2d at 1312.  At trial, the plaintiffs presented the testimony of two experts who opined that the neck pain was related to the car accident.  *Id.* at 443, 667 N.E.2d at 1313.  In contrast, the expert for the defense found no objective manifestations of neck injury and concluded that any such injury was not causally connected to the accident. *Id.*  The jury returned a verdict in favor of the plaintiffs, awarding each of them a portion of the medical expenses they incurred for the daughter's medical treatment after the accident.  *Id.* at 440, 667 N.E.2d at 1312.  The jury's damages award equaled the total of all medical bills incurred from the date of the accident through the daughter's final physical therapy session.  *Id.* at 442, 667 N.E.2d at 1312.  The jury did not award damages for later neck-related medical treatment; the court noted that this may have been due to evidence that the daughter suffered other possible neck injuries during that time, which defendant argued aggravated any neck injury caused by the accident in question.  *Id.* at 442, 667 N.E.2d at 1312-13.

The Illinois Supreme Court affirmed the lower courts' denial of the plaintiffs' subsequent motion for a new trial, concluding that it was not inconsistent for the jury to decline to award damages for pain and suffering despite awarding damages for pain-

related medical expenses in that case. *Id.* at 448, 667 N.E.2d at 1315. The court observed that the daughter "had few, if any objective symptoms of injury; she relied on subjective complaints of pain;" moreover, the defense expert "strongly disputed the nature and extent of the injuries and of any pain and suffering." *Id.* Noting that credibility was a significant issue in the case in light of the daughter's delay in seeking some of the treatment, her ability to continue participating in school sports, the subjective nature of her complaints, and the conflicting expert testimony, the court reasoned that the jury simply could have concluded that the plaintiff suffered only a minor injury and that her evidence of pain and suffering was unconvincing. *Id.* at 448-49, 667 N.E.2d at 1315-16.

In *Murray*, the plaintiff sought to recover damages for injuries arising from a water-skiing accident, in which the plaintiff was struck in the back of the head with a ski rope. *Murray*, 305 Ill. App. 3d at 514, 713 N.E.2d at 153. The plaintiff introduced evidence that, after the accident, an x ray showed she had "a straightening of the lordotic curve of her cervical spine, which was an objective sign that was consistent with her subjective complaints of stiffness and spasm." *Id.* at 515, 713 N.E.2d at 154. Although medical experts disagreed as to the extent of the plaintiff's injury, they all agreed that she had, in fact, sustained a soft-tissue injury. *Id.* The plaintiff missed nine weeks of work as a result of the injury, and there was no indication that any subsequent injury aggravated her condition between the time of the accident and the time of trial, although the defendant did suggest that "some" of the plaintiff's complaints of pain "could be attributed to the repetitiveness of her job." *Id.* The jury returned a verdict for the plaintiff, awarding her $1,600 for lost wages and home health care and $9,000 for

medical expenses, but nothing for pain and suffering. *Id.* at 514, 713 N.E.2d at 153.

The appellate court reversed the trial court's denial of the plaintiff's motion for a new trial

on damages on the grounds that the jury's award of zero damages for pain and

suffering ignored a proven element of damages. *Id.* at 516, 713 N.E.2d at 155. In

reaching this conclusion, the court distinguished this case from *Snover*, noting that here,

not only did the plaintiff complain of neck and head pain to emergency room personnel

after the accident, but she also produced x rays revealing an injury and evidence that

she had a limited range of motion in her neck. *Id.* The court concluded that the jury

was not free to disregard this objective evidence of pain and suffering, while

simultaneously awarding the plaintiff "substantially all of the damages she sought for her

medical expenses, home care, and lost wages, therefore acknowledging her injury and

need for treatment." *Id.*

Lastly, in *Stamp*, the plaintiff sought damages for injuries arising out of a car

accident. *Stamp*, 391 Ill. App. 3d at 117, 906 N.E.2d at 1223. She testified that after

the impact, she suffered severe lower back spasms, a headache, and neck stiffness.

*Id.* at 118, 906 N.E.2d at 1224. When she visited her doctor a few days later, she

complained of a headache and stiffness and soreness in her neck. *Id.* Her doctor

referred her to an orthopedic surgeon, who prescribed physical therapy. *Id.* The

orthopedic surgeon's records noted that the plaintiff had a cervical sprain with a loss of

sensation in the left thumb and index area. *Id.* at 125, 906 N.E.2d at 1230. At trial, the

defendant's expert testified that, based on MRI films and reports as well as the plaintiff's

subjective reporting, she suffered a soft tissue injury to her neck and back and an

aggravation of preexisting arthritis in her neck. *Id.* at 125, 906 N.E.2d at 1229. The

expert further testified that the plaintiff's physical therapy reports showed a decreased range of motion in her lumbar and cervical disc areas. *Id.* at 125, 906 N.E.2d at 1230. The jury returned a verdict for the plaintiff for past medical expenses in the amount of $4,348, but it awarded zero damages for pain and suffering. *Id.* at 122, 906 N.E.2d at 1227. The circuit court granted the plaintiff's subsequent motion for a new trial on damages on the ground that the verdict impermissibly ignored objective evidence of pain and suffering. *Id.* In light of the "uncontroverted evidence . . . that [the] plaintiff suffered a soft tissue injury to her neck and back," the appellate court concluded that the jury did indeed ignore a proven element of damages that it was not free to disregard when it awarded the plaintiff damages for medical expenses, but nothing for pain and suffering. *Id.* at 126, 906 N.E.2d at 1230. The court therefore concluded that the trial court had not abused its discretion by ordering a new trial on damages. *Id.*

Herrera offered more evidence of pain than the plaintiffs appear to have presented in *Snover*. Additionally, it is undisputed that Herrera began suffering from increasingly frequent bladder and urinary tract infections in 2011; her medical records confirm this. In this sense, Herrera's case is arguably more analogous to *Murray* and *Stamp*. With respect to Herrera's evidence of pain and suffering, however, although her medical records are replete with references to her complaints of pain and tenderness in the pelvic area, those complaints were subjective. The fact that they were memorialized in a great number of medical records does not transform them into objective evidence. In this case, the only truly objective signs of injury to which Herrera points appear to be the infections themselves. Aside from that, the evidence of Herrera's injury—complaints of pain—is primarily subjective, and the jury was free to determine that Herrera's

testimony regarding her pain was not credible. *Stamp*, 391 Ill. App. 3d at 125, 906 N.E.2d at 1230. Additionally, although Dr. Elser did not dispute that Herrera suffered from frequent bladder and urinary tract infections, pelvic pain, and pain during intercourse, she did provide an alternate explanation for the infections and pain: Herrera's diabetes. Based on Dr. Elser's testimony and the timing of Herrera's diabetes diagnosis, the jury could have determined that, although Herrera did suffer injuries from the TVT-O, her infections and pain were caused in part—or at least aggravated by—her diabetes. The existence of this alternate explanation for Herrera's infections and pain, laid out in great detail by Dr. Elser, distinguishes this case from *Murray* and *Stamp*. Ultimately, Herrera's case falls somewhere in between *Murray* and *Stamp* and *Snover*: although she provides some objective evidence of injury, much of her evidence of pain is subjective, and possibility that the jury could have attributed a portion of her injuries and any related pain and suffering to her co-existing diabetes complicates matters. The Court therefore cannot say that the jury's damages award was necessarily inconsistent, that it bore no reasonable relationship to the loss suffered, or that the jury ignored a proven element of damages in awarding Herrera damages for her medical expenses, but nothing for pain and suffering. Because the Court finds that the jury's decision, in its discretion, to award no damages for pain and suffering is not against the clear weight of the evidence nor does it otherwise constitute a miscarriage of justice, the Court concludes that a new trial is not warranted on this basis.

### 2. Exclusion of exhibit 4785

Herrera contends that the Court's exclusion of Exhibit 4785—a confidential June 2011 report commissioned by defendants regarding mesh erosion in pelvic floor

repair—was prejudicial error. Herrera attempted to introduce this exhibit through Dr. Rosenzweig to show that "Ethicon did, in fact, know that its TVT-O product would naturally and probably result in injury through degradation of the mesh." Pl.'s Mot. for New Trial at 14-15. Defendants objected to the admission of the report on the ground that it was hearsay and also argued that it postdated the implantation of the TVT-O in Herrera. The Court rejected Herrera's argument that the report was admissible as the statement of an opposing party, noted the timing of the report, and sustained defendants' objection. Defs.' Resp. to Pl.'s Mot. for New Trial, Ex. A 384:22-384:24. Herrera maintains that this report was admissible because, as a statement by an opposing party, it is not hearsay under Federal Rule of Evidence 801(d)(2).

Federal Rule of Evidence 801(d)(2) excludes from the definition of hearsay statements made by, and offered against, an opposing party. Fed. R. Evid. 801(d)(2). The rule defines opposing party statements to include statements made "by a person whom the party authorized to make a statement on the subject" and those "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(C), (D).

The report in question post-dated the implantation of Herrera's TVT-O by several years. Because Herrera could not have offered the report to prove defendants' awareness of TVT-O mesh degradation issues prior to Herrera's surgery, she could offer the report only to prove the truth of the matters asserted in the report: that there were degradation risks associated with the mesh. Herrera provides no argument or evidentiary foundation supporting her contention that the report, which was prepared by a consultant, constitutes a statement of an opposing party under either 801(d)(2)(C) or

23

801(d)(2)(D).  The Court reaffirms its prior ruling that the report is inadmissible hearsay; its exclusion was not in error.

### 3.    Exclusion of competitor sling recall evidence

Herrera also argues that the Court erred in excluding evidence that defendants' competitors removed their own midurethral sling devices from the market due to complications associated with the slings.  The Court excluded this evidence pursuant to Federal Rule of Evidence 403.  Herrera contends that evidence of the sling recalls was relevant to the issue of proximate cause because it undermined studies referring to pelvic mesh as the "gold standard" treatment for stress urinary incontinence.  Pl.'s Mot. for New Trial at 17.  Defendants argue that the exclusion of evidence regarding withdrawn competitor slings was proper because it was irrelevant, and any relevance it had was outweighed by the danger that it would unfairly prejudice or mislead the jury.  Specifically, defendants note that Herrera has not established that any of the withdrawn competitor slings were fair comparators to the TVT-O.  By way of example, defendants note that Boston Scientific's ProteGen, which was listed as a predicate device for defendants' TVT line of products and recalled in 1999, used different materials and had a different design from the TVT-O.  *See also In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 505234, at *9 (S.D.W. Va. Feb. 5, 2014) (excluding evidence that Boston Scientific recalled its ProteGen sling because "a recall of the ProteGen does not necessarily speak to the safety or efficacy [of] the technology used in the TVT").  Herrera makes no response to defendants' arguments in her reply brief.

Rule 403 provides that "[t]he court may exclude relevant evidence if its probative

value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Herrera has presented no argument regarding why the particular products that were recalled are comparable to the TVT-O, nor has she demonstrated that the questionable relevance of this evidence outweighs the danger that the jury would be misled into thinking that the competing slings that were removed from the market were fair comparators to the TVT-O.  The Court is not convinced that it was error to exclude this evidence under Rule 403.

### 4.    Denial of request to include "failure to test" in jury instructions on negligence

Lastly, Herrera argues that the Court erred in denying her proposed jury instruction for a negligence claim based on a "failure to test" theory, in addition to failure to warn and defective design theories.  The Court denied the proposed jury instruction in an August 22, 2017 minute order, in which it explained that there was no viable support for a "failure to test" negligence claim independent of a defective design or failure to warn claim.  *See* August 22, 2017 minute order (dkt. no. 308).  The Court further noted that Herrera could argue the failure to test evidence "as part and parcel of the claims of defective design and failure to warn"—which Herrera did—"but not in a way that suggests this is an independent claim."  *Id.*

Herrera points to *Elam v. Lincoln Electric Co.*, 362 Ill. App. 3d 884, 892, 841 N.E.2d 1037, 1045 (2005), in which an Illinois appellate court described the plaintiff's claim that the defendants, who were manufacturers of welding rods, breached a duty to investigate the health hazards associated with manganese in welding rods as being a "separate theory" from his failure to warn claim.  In that case, after the jury returned a

general verdict in favor of the plaintiff, the defendants moved for judgment notwithstanding the verdict, arguing that the plaintiff's failure to warn claim failed as a matter of law. *Id.*at 889, 841 N.E.2d at 1042. The court held that the plaintiff had presented sufficient testimony on the issue to submit it to the jury. *Id.*at 890, 841 N.E.2d at 1043. The court went on to note, in dicta, that even if it was incorrect on the failure to warn issue, the jury's general verdict could be sustained on the plaintiff's failure to investigate theory. *Id.* at 893, 841 N.E.2d at 1045. In response, defendants cite *Patton v. Country Place Condo Association*, No. 4-00-0008, 2000 WL 33728374, at *4 (Ill. App. Ct. July 7, 2000), in which another Illinois appellate court stated that failure to test was not a tort in and of itself. The court explained its reasoning as follows:

> The failure to test is not a negligent act in itself; rather, a failure to test leads to a failure to correct either a manufacturing [or design] defect or a failure to warn of harm resulting from the product. Thus, the duty to test does not cause injury by itself but is a subpart of designing a safe product, manufacturing it safely, and providing adequate warnings of dangers inherent in the use of the product.

*Id.* In short, Illinois law does not point clearly one way or the other. The Court is inclined to believe that the dispute does not make as much of a difference as Herrera contends, because of the interrelationship between testing, on the one hand, and design defects and warnings on the other (at least in a case like this one). Specifically, manufacturers have a duty to test their products to discover any defects or dangers associated with their use; if a defect or danger is discovered, the manufacturer can respond by changing the product's design or manufacturing process and / or warning consumers of the risks associated with the product. *Kociemba v. G.D. Searle & Co.*, 707 F. Supp. 1517, 1527 (D. Minn. 1989); *see also Couick v. Wyeth, Inc.*, No. 3:09-CV-210-RJC-DSC, 2012 WL 79670, at *7 (W.D.N.C. Jan. 11, 2012) (dismissing failure to

test claim on the ground that no injury can result from failure to test unless it resulted in a product that is defective in design, manufacture, or warning).

Even in *Burton v. R.J. Reynolds Tobacco Co.*, 397 F.3d 906 (10th Cir. 2005), which Herrera contends supports her position that failure to test can be an independent basis for liability, suggests that a failure to test claim assumes the existence of some underlying defect or danger associated with the product. In *Burton*, the Tenth Circuit affirmed a jury verdict in favor of the plaintiff on a "negligent failure to test claim" brought under Kansas law, which recognized such a claim. *Id.* at 919. Nonetheless, the Tenth Circuit specifically noted that Kansas law required a plaintiff bringing a negligent failure to test claim to prove that the manufacturer's failure to test its product resulted in a product that contained either a manufacturing defect, a warning defect, or a design defect that ultimately caused her injury. *Id.* at 920.

The bottom line, however, is that the Court did not preclude Herrera from arguing her failure to test theory; it permitted her to argue the point as part and parcel of her negligence claim. With that in mind, it is difficult to see how Herrera was prejudiced. The Court concludes that it was not error to deny Herrera's proposal to include a "failure to test" line item in the jury instructions for negligence.

In light of the foregoing, the Court denies Herrera's motion for a new trial. Because the Court concludes that a new trial is not warranted on any issues, the Court need not evaluate whether the requirements for a new trial on damages are met.

## C. Herrera's bill of costs

Herrera requests nearly $58,000 in costs. Unless a federal statute, the Rules of Civil Procedure, or a court order dictates otherwise, costs other than attorney's fees

generally should be allowed to the "prevailing party." Fed. R. Civ. P. 54(d). The presumption that the prevailing party will recover costs is difficult to overcome. *E.g.*, *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 383 (7th Cir. 2018); *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000). For a particular expense to be compensable, however, it must fit within one of the categories of costs that is authorized for reimbursement under 28 U.S.C. § 1920. *Cefalu*, 211 F.3d at 427. Costs that are reimbursable pursuant to section 1920 include "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case," and "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case." 28 U.S.C. § 1920(2), (4). The Supreme Court has emphasized that the scope of taxable costs under section 1920 is narrow and "limited to relatively minor, incidental expenses." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 573 (2012).

Defendants dispute whether Herrera is actually the prevailing party in this case, because although the jury returned a verdict in her favor on the negligent misrepresentation claim, it found for defendants on the negligence and strict liability claims and declined to award punitive damages. They also argue that even if the Court does determine that Herrera is the prevailing party, it should exercise its discretionary power to reduce Herrera's reimbursable costs by 75 percent to reflect the fact that the jury found in favor of defendants on three of the four[2] asserted claims. Defendants also oppose many of the specific costs claimed by Herrera.

---

[2] Defendants inexplicably treat Herrera's request for punitive damages as a separate claim for purposes of this request.

Contrary to defendants' assertions, a party need not win on every claim to qualify as a prevailing party. *Slane v. Mariah Boats, Inc.*, 164 F.3d 1065, 1068 (7th Cir. 1999). "A party prevails for purposes of Rule 54(d) when a final judgment awards it substantial relief." *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 573 F.3d 523, 525 (7th Cir. 2009). The handful of cases cited by defendants, in which the court declined to award costs to a particular party on the ground that it was not a "prevailing party" within the meaning of Rule 54(d) despite prevailing on some of its claims, are distinguishable from the present situation. In all but one of those cases, the plaintiff requesting costs only had partial success against some, but not all, of the multiple defendants named in the case. *See Testa v. Village of Mundelein*, 89 F.3d 443 (7th Cir. 1996) (affirming district court's denial of costs to plaintiff who sued several police offers for unlawful arrest and the Village of Mundelein for malicious prosecution, but succeeded only on the malicious prosecution claim and received damages of $1,500); *Thorncreek Apartments I, LLC v. Village of Park Forest*, 123 F. Supp. 3d 1012, 1014 (N.D. Ill. 2015) (no costs to plaintiff who "prevailed on just one of several claims against just two of eleven defendants"); *Ellis v. Country Club Hills*, No. 06 C 1895, 2012 WL 4009701 (N.D. Ill. Sept. 12, 2012) (no costs to plaintiff who sued two police office for excessive force but only prevailed against one of them and received damages of just $1). The other case, *Gilfand v. Planey*, No. 07 C 2566, 2012 WL 5845530, at *5-6 (N.D. Ill. Nov. 19, 2012), is entirely unlike the situation at hand; in that case, the court refused to recognize as a prevailing party a defendant who was found liable for only one of the five claims against him but had punitive damages assessed on that claim. In the present case, because the jury returned a verdict in favor of Herrera—and against both defendants—on the negligent

misrepresentation claim and awarded her $55,000 in damages, the Court concludes that she is a prevailing party entitled to costs under Rule 54(d).

Further, although it is true that a court has "broad discretion . . . to reduce the amount of costs awarded [to a plaintiff] based on the mixed result she obtained," the Court does not find it appropriate to reduce Herrera's costs by 75 percent simply because she was unsuccessful on her negligence and strict liability claims, as well as her request for punitive damages. *Masud v. Rohr-Grove Motors, Inc.*, No. 13 C 6419, 2016 WL 3418567, at *2 (N.D. Ill. June 22, 2016). Although they required different elements of proof, Herrera's negligence and strict liability claims overlapped in large part with the negligent misrepresentation claim—much of the evidence and testimony presented at trial was relevant to all three claims. Under these circumstances, it makes no sense to attempt to break down which of Herrera's costs are specifically attributable to the negligent misrepresentation claim or to reduce her total costs by an arbitrary percentage. The Court therefore declines to reduce Herrera's costs by 75 percent across the board.

### 1.      Fees of the clerk and marshal

Fees of the clerk and marshal are taxable pursuant to 28 U.S.C. § 1920(1). This includes private process service fees, limited to the rate that would be charged by the United States Marshals Service. *See Collins v. Gorman*, 96 F.3d 1057, 1060 (7th Cir. 1996); *see also* 28 C.F.R. § 0.114(a)(3) (rate for process served or executed personally is $65 per hour for each item served,  plus travel costs and other out-of-pocket expenses).

Although Herrera initially sought reimbursement for service of three trial

subpoenas that were later voluntarily withdrawn, Herrera has withdrawn that request and reduced the requested process server's fee accordingly. Herrera now seeks a total of $476.83 in service and filing fees, broken down as follows: $350.00 in filing fees, $54.46 for the remaining trial subpoena, and $72.37 for service of process. Because these costs are recoverable and defendants do not object to them, the Court awards Herrera the requested $476.83 in costs for fees of the clerk and marshal.

## 2. Fees for printed or electronically recorded transcripts (fees of the court reporter)

The Court may tax as costs "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." 28 U.S.C. § 1920(2). A district court may tax costs for transcribing a deposition as well as costs for videotaping a deposition under this section. *See, e.g.*, *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 701 (7th Cir. 2008) (per curiam); *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 0242, 2011 WL 5008425, at *3 (N.D. Ill. Oct. 20, 2011).

### a. Trial and pretrial hearing transcripts

Herrera seeks $1,819.20 in costs for pretrial hearing transcripts and daily trial transcripts. Herrera contends that she used the daily trial transcripts to prepare for the cross-examination of Dr. Elser, closing argument, and post-trial motions. She asserts that it was reasonably necessary to obtain a transcript of the July 2017 hearing on motions *in limine* and the August 2017 final pretrial conference because it was important to have a written record of the Court's oral rulings. Defendants object to these costs on the ground that Herrera has not sufficiently justified her need for the pretrial hearing and daily trial transcripts, and they note that this Court has declined to tax trial transcript costs in other cases where the party requesting costs failed to explain why the

transcripts were needed "to prepare for an argument on a motion." *Engate, Inc. v. Esquire Deposition Servs. LLC*, No. 01 C 6204, 2006 WL 695650, at *3 (N.D. Ill. Mar. 13, 2006).

Herrera's explanation for why these transcripts were necessary is more detailed than that provided by the parties requesting costs in *Engate*. Herrera specifically stated in the bill of costs that the trial transcripts were used to prepare for cross-examination, closing argument, and post-trial motions, and she further explained that the transcript of the pretrial proceedings provided a written record of the Court's oral rulings on a number of pretrial motions. The Court is convinced that the transcripts in question were reasonably necessary and therefore taxable under 28 U.S.C. § 1920(2). Accordingly, Herrera is entitled to $1,819.20 in costs for trial and pretrial hearing transcripts.

### b. Deposition transcripts

Herrera has requested a total of $5,510.62 in costs associated with stenographic transcripts of depositions. Defendants object to these costs for several reasons. First, defendants contend that nearly all of the invoices submitted by Herrera exceed the maximum per-page transcript copy rate set by the Judicial Conference of the United States; they argue that the transcript rates should be reduced to $0.90 per page. Defendants also object to the taxing of costs for copies of deposition exhibits because the exhibits were produced before the depositions and copies were provided to counsel at the depositions. Defendants additionally take issue with Herrera's attempt to recover costs for shipping and handling, expedited processing, and realtime and rough draft transcripts on the ground that they were not necessary costs but instead costs incurred for the convenience of Herrera's counsel. The Court considers each of these objections

in turn.

Under Northern District of Illinois Local Rule 54.1(b), claimed transcript costs may not exceed the regular copy rate established by the United States Judicial Conference. *See* N.D. Ill. L.R. 54.1(b); *The Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2017 WL 4882379, at *4 (N.D. Ill. Oct. 30, 2017). The current rates are $3.65 per page for ordinary transcripts and $0.90 per page for the first copy. *See* U.S. Courts, Federal Court Reporting Program, http://www.uscourts.gov/services-forms/federal-court-reporting-program#rates (last visited Mar. 21, 2018). A review of the invoices submitted by Herrera reveals that she was charged $3.85 per page for some deposition transcripts and $3.25 per page for others. *Compare* Pl.'s Mem. in Supp. of Mot. for Bill of Costs (Pl.'s Bill of Costs), Ex. C , at 3, 6, 16 ($3.85 per page) *with id.* at 2, 4, 8, 17-19 ($3.25 per page). The Court awards costs for all deposition transcripts billed at the $3.25 per page rate. That rate falls below the current maximum rate for ordinary transcripts, which, as previously noted, is $3.65 per page ($0.90 is the rate for the first copy of a transcript). The Court will not, however, award the full amount of costs claimed by Herrera for the transcripts billed at the $3.85 per page rate. The cost of each deposition billed at the $3.85 per page rate must therefore be recalculated at the maximum rate of $3.65 per page, which is all that Herrera is entitled to.

Courts in this district have found costs associated with deposition exhibits taxable on the ground that "exhibits are essential to understanding the content of a deposition, especially in a complex and heavily litigated case." *LG Electronics*, 2011 WL 5008425, at *2. In *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 456 (7th Cir. 1998), however, the Seventh Circuit denied deposition exhibits costs because the party

requesting costs "was already in possession of the deposition exhibits—plaintiff provided extra copies of the exhibits to defendant at the deposition and produced the same exhibits during discovery." Herrera does not dispute defendants' contention that she either was already in possession of the relevant exhibits at the time of the depositions or was provided with copies at the depositions, and she makes no effort to distinguish the facts of the present situation from those in *Cengr*. The Court therefore finds that the deposition exhibit costs incurred were not reasonably necessary but instead were for the convenience of counsel; all costs associated with the scanning of deposition exhibits are denied.

Lastly, although, as defendants point out, in *Finchum v. Ford Motor Co.*, 57 F.3d 526, 534 (7th Cir. 1995), the Seventh Circuit held that the district court did not abuse its discretion in awarding costs "'incidental' to the taking of the depositions, . . . such as per diem and delivery charges by the court reporter," that decision in no way compels the Court to tax such incidental costs where they have not been justified as reasonably necessary by the party claiming them. *See, e.g.*, *Bellamy v. City of Chicago*, No. 15 C 02678, 2017 WL 3675729, at *18 (N.D. Ill. Aug. 25, 2017) (declining to allow recovery of delivery fee "where there is no apparent special justification for having the transcripts delivered"); *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, No. 13 C 321, 2016 WL 316865, at *3 (N.D. Ill. Jan. 26, 2016) ("Although the Seventh Circuit has held that a district court *may* award deposition shipping costs as 'incidentals' in the court's discretion, . . . costs associated with delivering, shipping, or handling transcripts are typically non-recoverable ordinary business expenses.") (emphasis added).

In response to defendants' contention that Herrera has failed to show why costs

for deposition shipping and handling, expedited processing, and realtime and rough draft transcripts are necessary and reasonable, Herrera argues that all these costs were necessary "because of the time[-]sensitive nature of this litigation." Pl.'s Reply in Supp. of Bill of Costs at 9. Herrera specifically notes that, because Dr. Rosenzweig's second deposition was taken just a week before trial, expedited processing was necessary. The Court agrees that expedited processing was necessary for Dr. Rosenzweig's August 2017 deposition and awards the $275.01 "daily surcharge" cost accordingly but finds in the record no reason why any other depositions needed to be expedited. *See* Pl.'s Bill of Costs, Ex. C, at 4 ($275.01 "Daily Surcharge"). The Court therefore denies the expedited surcharge for all other depositions, which were conducted well before trial. *See id.* at 8 ($313.47 "4 Day Expedited Surcharge"); *id.* at 16 ($244.80 "3 Day Expedited Surcharge"); *see also Meyer v. Ward*, No. 13 C 3303, 2018 WL 905518, at *2 (N.D. Ill. Feb. 15, 2018) (costs for expedited transcripts not allowed absent a showing that it was reasonable and necessary to order transcripts on an expedited basis). The Court also denies the claimed shipping and handling costs, because they are unrecoverable, ordinary business expenses incurred for Herrera's convenience. *See, e.g.*, *Intercontinental Great Brands*, 2016 WL 316865, at *3; *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, No. 07 CV 623, 2014 WL 125937, at *4 (N.D. Ill. Jan. 14, 2014). The costs associated with the realtime and / or rough draft transcripts ordered in connection with Dr. Vassallo's December 2015 deposition and Dr. Elser's March 2016 deposition are likewise denied because Herrera has made no attempt to explain why these costs are reasonable and necessary. *See* Pl.'s Bill of Costs, Ex. C, at 6 ($261.25 for realtime and $240.35 for rough draft transcript); *id.* at 16 ($86.25 for rough draft

transcript).  Lastly, the Court awards the $95.00 appearance fees for the depositions of Dr. Elser and Dr. Vassallo, to which defendants do not object.  *See id.* at 3, 6 ($95.00 "Appearance Fee"); *see also Fairley v. Andrews*, No. 03 C 5207, 2008 WL 961592, at *7 (N.D. Ill. Apr. 8, 2008) (awarding $105.00 deposition attendance fee).

The Court directs Herrera to recalculate her deposition transcript costs to account for (1) the reduced $3.65 per page rate for the transcripts billed at the $3.85 per page rate, (2) the exclusion of all deposition exhibit costs, (3) the exclusion of all expedited processing costs other than those associated with Dr. Rosenzweig's August 2017 deposition, (4) the exclusion of all shipping and handling costs, and (5) the exclusion of all realtime and rough draft transcript costs.

### c.    Deposition video-recording

Herrera seeks an additional $3,120.00 in video deposition costs.  Defendants first argue that the Court should deny all video deposition costs because Herrera "cannot show why the Court should depart from the general rule that a party may not recover both video and stenographic transcript costs."  Defs.' Resp. in Opp. to Pl.'s Bill of Costs at 12.  There is no such general rule.  The Seventh Circuit has expressly held that "the costs of *both* video-recording and stenographic transcription" may be "taxed to the losing party."  *Little*, 514 F.3d at 702 (emphasis added).  "[T]he standard is whether it was reasonably necessary for counsel to obtain both."  *The Medicines Co.*, 2017 WL 4882379, at *5 (citation omitted).  Courts in this district have found it reasonably necessary for a party to obtain both a stenographic transcript and a video recording of a deposition if it knows that its opponent obtained a video recording of that deposition. *See, e.g.*, *The Medicines Co.*, 2017 WL 4882379, at *5; *Intercontinental Great Brands*,

2016 WL 316865, at *2.  Herrera contends that because the video depositions in question were taken by defendants, it was reasonably necessary for her to obtain a copy.  The Court agrees and therefore concludes that the costs of both video-recording and stenographic transcription may be taxed to defendants in this case.

Next, defendants point out that the case name listed on two of the invoices related to Dr. Kenton's deposition is *Terreski Mullins v. Ethicon*, not *Herrera-Nevarez v. Ethicon*.  *See*  Pl.'s Bill of Costs, Ex. C, at 13-14.  Defendants contend that the Court should not award costs related to Dr. Kenton's deposition because she was deposed as a general expert in the multidistrict litigation, and Herrera cannot show why the costs are taxable to her particular case.  Even though Dr. Kenton was deposed as general expert for the defense, Herrera needed her deposition video recording to prepare for this particular litigation.  It was therefore reasonable and necessary for Herrera to obtain the video recording of Dr. Kenton's deposition, even though she was not originally deposed specifically for Herrera's case.  Provided counsel (i.e., the attorneys who tried the present case for Herrera) does not attempt to recover the same costs in any other litigation, the Court sees no reason to deny costs related to Dr. Kenton's deposition video recording here.

Lastly, defendants object to the costs of the thumb drives on which the deposition video recordings were captured and to the costs of shipping and handling of the recordings on the ground that these costs were incurred merely for the convenience of counsel.  The Court agrees that shipping and handling expenses associated with the deposition video recordings are not recoverable, for reasons already explained.  On the other hand, because many modern laptops lack a DVD drive, the Court believes that the

cost of the thumb drives containing the digital video-recording files was a necessary expense, rather a cost incurred merely for convenience. *Cf. The Medicines Co.*, 2017 WL 4882379, at *5 (if it is reasonably necessary to obtain a video deposition, the costs associated with digitalization may also be taxed). The Court therefore denies all shipping and handling costs associated with the deposition video recordings, but awards costs for the thumb drives, capture of master tapes to MPEG1 format, and encoding and synchronization in the amount of $3,010.00 (costs requested minus shipping and handling costs). *See LG Electronics*, 2011 WL 5008425, at *3 ("Costs associated with digitalization and synchronization of videotaped depositions may also be taxed.").

### 3. Witness fees

The Court may tax as costs "[f]ees and disbursements for . . . witnesses." 28 U.S.C. § 1920(3). "A witness shall be paid an attendance fee of $40 per day. . . ." *Id.* § 1821(b).

In her initial bill of costs, Herrera requested $651.50 in witness fees, but she has since withdrawn her request for fees for her own deposition and trial attendance. Herrera now seeks only $240.00 in witness fees: $40 for Chelsea Herrera's attendance at a July 2017 deposition, $80 for Dr. Rosenzweig's attendance at March 2016 and August 2017 depositions, $80 for the two days Dr. Rosenzweig attended the trial, and another $40 for Chelsea Herrera's trial attendance. Herrera is entitled to the requested $240.00 in witness fees.

### 4. Fees for exemplification and copies

Pursuant to section 1920(4), the Court also may tax "[f]ees for exemplification

and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."  *Id.* § 1920(4).

### a.    Exemplification

Herrera requests $33,860.00 in exemplification costs for computer-generated exhibit production, multi-media equipment, and trial technology services.  She contends that the computerized demonstrative exhibits and multimedia presentation were "critical aids" in presenting evidence to the jury and clarifying highly technical and contested expert witness testimony.  Pl.'s Bill of Costs at 11.  Defendants argue that the Court should deny this request in its entirety because Herrera has not sufficiently explained why her claimed exemplification expenses were necessary and reasonable.

Section 1920(4) does not define "exemplification."  The Seventh Circuit has held that, for purposes of section 1920(4), exemplification includes "a wide variety of exhibits and demonstrative aids" and would permit an award of costs for everything from preparing maps, charts, graphs, and motion pictures to presenting computerized, multimedia displays.  *Cefalu*, 211 F.3d at 427-28; *see also Bell v. Keating*, No. 09-CV-754, 2011 WL 2182117, at *4 (N.D. Ill. June 2, 2011) ("The Seventh Circuit adopts an expansive view of exemplification, defining such expenses as encompassing not only graphs and charts, but also sophisticated multi-media presentations.").  The Seventh Circuit has explained that "[s]o long as the means of presentation furthers the illustrative purpose of an exhibit, we believe it is potentially compensable as exemplification."  *Cefalu*, 211 F.3d at 428.  To be recoverable, however, the exemplification must also have been "necessarily obtained for use in the case."  28 U.S.C. § 1920(4); *see also Cefalu*, 211 F.3d at 428-29.  In evaluating the necessity of certain types of

exemplification, courts consider "whether the nature and context of the information being presented genuinely called for the means of illustration that the party employed. In other words, was the exemplification vital to the presentation of the information, or was it merely a convenience or, worse, an extravagance?" *Id.*

As previously noted, Herrera contends that the computerized demonstrative exhibits and multimedia presentation allowed her to quickly and clearly highlight the relevant parts of highly specialized expert witness testimony and large and complex exhibits. Defendants say this explanation is not good enough, because it does not provide sufficient detail regarding the costs claimed and does not establish why the exemplification was "an essential aid to understanding an issue in the case," rather than technology used solely for counsel's convenience. *Se-Kure Controls, Inc. v. Vanguard Prod. Grp., Inc.*, 873 F. Supp. 2d 939, 949 (N.D. Ill. 2012) (citations omitted). Defendants also take issue with Herrera's attempt to include the costs of "video deposition editing for trial" as exemplification costs, because she has not explained how the video depositions constitute demonstrative aids as opposed to testimonial evidence. *See* Pl.'s Bill of Costs, Ex. E, at 5-8. Lastly, defendants argue that Herrera's use of trial technology for exemplification purposes was essentially limited to the use of PowerPoint presentations and documents displayed on a courtroom projector, which does not justify over $33,000 in costs. Herrera does not respond directly to defendants' objection to the video deposition editing costs, but she explains in her reply brief that the multimedia presentation (and the technology used to generate it) was essential to aid the jury's understanding of the medical evidence in this complex case. Specifically, she notes that the presentation summarized over twelve years of medical treatment, as well as

40

numerous corporate documents and product warnings, and illustrated how a TVT-O device is implanted, among other things. Herrera does not attempt to explain, however, why $33,860.00 was a <u>reasonable</u> amount to spend on these exemplification efforts.

Given the complex nature of the case and the volume of information presented, the Court agrees that computerized exhibit production, a multimedia presentation (including the technology used to prepare and present it), and the related editing of video depositions clips for trial were not "extravagances" but instead were reasonably necessary to present Herrera's case at trial. *See The Medicines Co.*, 2017 WL 4882379 at *12 (awarding video deposition clipping and syncing fees as exemplification costs). Nonetheless, in light of Herrera's failure to explain why $33,860.00 is a reasonable amount of money to spend on exemplification costs for a seven-day trial, in the exercise of its discretion, the Court awards costs for exemplification in the reduced amount of $16,930.00, which is half of the requested amount.

### b. Copies

Herrera seeks $3,740.00 in copying costs. Defendants argue that she is not entitled to any copying costs because she has failed to substantiate that the costs were necessary and reasonable. They also argue that the $2,166.80 claimed for witness designation charts copied, tabbed, and bound in July 2017 is unreasonable.

A party is "not required to submit a bill of costs containing a description so detailed as to make it impossible economically to recover photocopying costs"; instead, it need only provide "the best breakdown obtainable from retained records." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991). Copying costs may include costs for binding and inserting tabs because such services

are often "necessary to reproduce a document in a way that is organized and useful to the opposing party and the court." *First City Sec., Inc. v. Shaltiel*, No. 92 C 2620, 1993 WL 408370, at *2 (N.D. Ill. Oct. 8, 1993). Although a party's description of copying costs need not be extremely detailed, a court cannot award copying costs unless it has some confidence that the costs are, in fact, recoverable, reasonable, and not incurred merely for the convenience of counsel. *Chicago Board*, 2014 WL 125937, at *1, 8 (citation omitted). "Where a party fails to substantiate all of the costs it claims were necessary and reasonable, the Court will reduce the costs to the level supported by [the party's] proof—even if that is zero." *Se-Kure Controls*, 873 F. Supp. 2d at 947 (internal quotation marks and citation omitted). Courts in this district have denied costs for copies where the party requesting costs has not attempted to "match the dates of the copying, printing, and binding to when documents were filed to explain the necessity of the charges." *Chicago Board*, 2014 WL 125937, at *8; *see also Fait v. Hummel*, No. 01 C 2771, 2002 WL 31433424, at *5 (N.D. Ill. Oct. 30, 2002) (denying copying costs where invoices describe per-page rate and price, but defendants failed to provide "a more detailed affidavit or some other reliable verification that the copied documents were necessary to presenting evidence to the court").

Except for one invoice for $2,166.80 that indicates that the copies made were related to witness designation charts, the invoices Herrera has submitted in support of her copying costs do not specify the types of documents that were copied. Instead, the invoices only list the types of services provided (e.g., black & white printing, color printing, custom tabs, binding services), the per-page rate for those services, and the totals due. Because Herrera makes no attempt to match the invoices to any particular

42

set of documents or otherwise break down the expenses, it is impossible for the Court

to determine exactly how much of the claimed copying costs were reasonably

necessary for litigation. The Court therefore denies the requested copying costs except

for the $2,166.80 in costs requested for copies of the witness designation charts. *See*

Pl.'s Bill of Costs, Ex. D, at 3. Although the Court agrees with defendants that

$2,166.80 seems like a lot of money for a copy of the witness designation charts, almost

half of the bill—$1,056.00—is attributable to color printing. *See id.* Defendants do not

argue that it was unnecessary for Herrera to print so many pages in color, however, and

the $0.75 per page rate charged for color copies is not unreasonable. *See Plyler v.*

*Whirlpool Corp.*, No. 08 C 6637, 2012 WL 5845428, at *4 (N.D. Ill. Nov. 19, 2012)

($1.25 per color copy is a reasonable rate). The Court therefore awards $2,166.80 in

costs for copies associated with the witness designation charts, but denies the other

requested copying costs.

### 6. Expert deposition fees

Rule 26(b)(4)(E) provides that "[u]nless manifest injustice would result, the court

must require that the party seeking discovery . . . pay the expert a reasonable fee for

time spent" responding to discovery, such as a deposition. Fed. R. Civ. P. 26(b)(4)(A),

(E). Herrera seeks $9,000.00 in expert witness fees for Dr. Rosenzweig's time

preparing for and attending his March 2016 and August 2017 depositions pursuant to

Federal Rule of Civil Procedure 26(b)(4)(E).[3] Defendants make no objection to this

---

[3] Herrera erroneously cites to Rule 26(b)(4)(C) in her brief, even though it was
renumbered as Rule 26(b)(4)(E) in December 1, 2010. No substantive changes to the
language contained in former Rule 26(b)(4)(C) were made at that time. *See* Fed. R.
Civ. P. 26, advisory committee's notes to 2010 Amendments.

request.

Courts in the Northern District of Illinois have held that costs associated with the time an expert spends preparing for a deposition and the time the expert spends attending the deposition are recoverable. *See, e.g.*, *Se-Kure Controls*, 873 F. Supp. 2d at 956; *LG Electronics*, 2011 WL 5008425, at *4. "The party seeking reimbursement of their expert witness fees has the burden of demonstrating to the court that the expert's rate and fee are reasonable." *Se-Sure Controls*, 873 F. Supp. 2d at 955.

Herrera bases the $9,000.00 figure on Dr. Rosenzweig's $750 per hour rate for review of medical records and his $1,500 per hour rate for depositions. *See* Pl.'s Bill of Costs, Ex. I. Dr. Rosenzweig's first deposition, which was taken in March 2016, lasted just over two hours, and the second deposition, taken in August 2017, lasted just under an hour and a half. *See* Pl.'s Bill of Costs, Ex. H. The invoice for $15,750.00 that Dr. Rosenzweig submitted to Herrera's counsel in March 2016 appears to include time spent preparing for and attending depositions for multiple cases, one of which was Herrera's. *See* Pl.'s Bill of Costs, Ex. G., at 2. Herrera has submitted bank records showing that she made a payment of $5,250.00 to Dr. Rosenzweig in response to that invoice. *Id.* at 3. For the August 2017 deposition, Dr. Rosenzweig billed Herrera for one hour of deposition time (at $1,500 an hour) but did not indicate how much time he spent preparing for the deposition (the hours billed for preparation included trial preparation time). *Id.* at 4. As Herrera points out, a 3 to 1 ratio of preparation to deposition time is considered reasonable in complex cases. *E.g.*, *LG Electronics*, 2011 WL 5008425, at *5. The Court will allow Herrera to recover costs for three hours of preparation for the August 2017 deposition, bringing the costs recoverable from the

August 2017 deposition to $3,750 and the total costs recoverable to $9,000.  Because

the Court finds no basis for barring recovery of these fees and defendants do not object,

the Court awards Herrera the requested $9,000.00 in expert witness fees.

### Conclusion

For the foregoing reasons, the Court denies defendants' renewed motion for

judgment as a matter of law [dkt. no 321] and denies plaintiff's motion for a new trial

[dkt. no. 322].  Defendants' motion for judgment as a matter of law [dkt. no. 296] and

prior renewed motion for judgment as a matter of law [dkt. no. 311] are terminated as

moot.  Lastly, the Court grants plaintiff's bill of costs in part and denies it in part [dkt. no.

326].  The Court will tax defendants $28,813.63, plus the recalculated cost of fees for

printed or electronically recorded transcripts (claimed as "fees of the court reporter" in

the bill of costs).  Herrera is to provide the requested recalculation within five days of

entry of this order.  The remainder of the bill of costs is overruled.

Date:  March 23, 2018                    _____
                                                         MATTHEW F. KENNELLY
                                                         United States District Judge